## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 19 2020, 8:40 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Cory A. Shoffner
Brody B. Shoffner
Shoffner & Shoffner, LLP
LaPorte, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Marriage of: <br> Todd M. Pieszchala, <br> *Appellant-Respondent,* <br><br> v. <br><br> Jamie Pieszchala, <br> *Appellee-Petitioner.* | November 19, 2020 <br><br> Court of Appeals Case No. <br> 20A-DR-969 <br><br> Appeal from the <br> LaPorte Superior Court <br><br> The Honorable <br> Richard R. Stalbrink, Jr., Judge <br><br> Trial Court Cause No. <br> 46D02-1305-DR-236 |

**Kirsch, Judge.**

[1] Todd M. Pieszchala ("Father") appeals the trial court's order denying his petition to modify child custody. He raises the following issue for our review: whether the trial court erred in finding that he did not meet his burden that a

modification was in the best interests of the children and that there was a substantial change in circumstances.

[2] We affirm.

## Facts and Procedural History

[3] Father and Mother are the parents of Ai.P., who was ten years old at the time of the order denying Father's petition to modify custody, and Ad.P., who was nine years old (together, "the Children"). *Tr. Vol. II* at 27. The marriage between Father and Mother was dissolved in 2014, and a Stipulated Modification of Custody was entered on April 28, 2017. *Appellant's App. Vol. II* at 11. At that time, both parties were granted joint physical custody of the children, with Father exercising parenting time "every Wednesday after school to Friday morning and alternating weekends commencing Friday after school until Sunday at 4:30 p.m." *Id*. On June 24, 2019, Father filed a motion to modify custody. *Id*. at 7. A bifurcated hearing was held on the petition on December 18, 2019 and on March 2, 2020. *Id*. at 9; *Tr. Vol. II* at 8, 126.

[4] At the hearing, Mother testified that, since the dissolution, she had four different places of employment in the last five years, and she has lived at five different locations with the Children. *Id*. at 23-24, 37. In February 2018, Mother had been asked to leave the home she was renting or be evicted due to failure to pay rent consistently. *Id*. at 23-24, 99. Mother also testified that there was an order to vacate filed for the home she was renting at the time of the

hearing, but that she had paid her rent, and the landlord allowed her to remain in the home.  *Id*. at 15-16, 142.

[5]     Evidence was presented that Mother had received several disconnect notices for her water dated May 22, 2019, August 22, 2019, and September 19, 2019.  *Id*. at 17; *Appellant's App. Vol II* at 19-30.  Mother testified that her water had been shut off "once" and was "paid and restored on the same day."  *Tr. Vol. II* at 18-19.  Mother disputed the records from the water company indicating that her water was shut off on July 2, 2019 through July 8, 2019, on September 4, 2019 through September 10, 2019, and on December 2, 2019 through December 4, 2019, stating that "we can't go six days without water at our house."  *Id*. at 20; *Appellant's App. Vol II* at 31-50.  Mother was later asked "your water hasn't been shut off three times," to which she responded, "I'm not saying it hasn't been turned off three times.  I'm saying I haven't gone without water on a numerous daily basis."  *Id*. at 21.  The custodian of records for the Westville Water Department testified that the water was shut off for the time periods mentioned above.  *Id*. at 133.  Evidence was also presented of gas and electric disconnect notices for Mother's prior address, indicating a shut off from July 23, 2018 to July 25, 2018.[1]  *Id*. at 22; *Appellant's App. Vol II* at 51-130.

---

[1] We note there is a discrepancy in the dates that Mother lived at this prior address, as she testified that she was asked to move out of the address in February 2018, but evidence was also presented that her gas and electric had been shut off at that address from July 23, 2018 to July 25, 2018.  *Tr. Vol. II* at 23-24,

[6] Mother testified that during spring break in 2019 and the summer of 2019, she allowed the Children, who were ten years old and almost nine years old at the time, to stay home alone for periods of time while she worked. *Tr. Vol. II* at 28. She testified that her employer was flexible and allowed her to come and go as she needed to check on the Children and that she had lunch with them every day. *Id.* Mother testified that she allowed the Children to take baths while she was not home and stated that she believed that they were responsible enough to do so. *Id.* at 35. Mother stated that she believed that the Children were mature enough and old enough to be left alone for certain periods of time. *Id.* at 60.

[7] Evidence was presented that Ai.P. was diagnosed with ADHD and takes medication. *Id.* at 28. Mother stated that in the prior year there were two or three times that Ai.P. had not taken his medication while in her care. *Id.* at 45. Ai.P.'s teacher testified that there were at least two occasions that she suspected Ai.P. had not taken his medication. *Id.* at 79. Testimony was also presented that Ad.P. wears glasses and that there were multiple times where Ad.P. would forget to wear her glasses to school and Mother would need to bring them to school. *Id.* at 31, 92. There was testimony presented that Ai.P. was browsing inappropriate websites on his cell phone on more than one occasion and was caught by Father, who made Mother aware of it. *Id.* at 35. Mother stated that, after discovering this, she installed an app on the cell phone to allow her to monitor Ai.P.'s phone. *Id.* Mother admitted that there had been issues where Ai.P. was not turning in his homework and was suspended from playing

basketball for a week. *Id*. at 33. She testified that this prompted her to physically check his homework every night. *Id*. at 32-33.

[8] Father testified that he suspected on three different days after the children were in Mother's care that the children had not brushed their teeth. *Id*. at 10. When Mother was asked if she made sure that the Children brushed their teeth before they went to school, she responded that she always instructed them to, but that she did not "stand over their shoulder every morning." *Id*. at 46.

[9] At the first hearing date, Mother testified that the children "have emotional damage" and are "in therapy right now on my days." *Id*. at 65-66. At the second hearing, Mother then acknowledged that "[the children] hadn't started therapy" despite her previous testimony and stated it was because Father would not agree to anything. *Id*. at 141, 148. Testimony was presented that Ad.P. had been given a special needs diagnosis and "both [Father] and [Mother] have kept up in communication with her teachers and the schools to help develop a plan to get her to where she needs to be." *Id*. at 68, 69. Ad.P.'s second grade teacher testified that several meetings were scheduled and that Mother did not come to one, was late to another, and canceled another meeting. *Id*. at 87. The teacher further testified that she and Father had communicated during the spring of 2019 regarding learning disability testing meetings, but Father could not make the decision because of his lack of educational custody. *Id*. at 88. When asked if it was fair to say that Mother's cancellation delayed the testing, the teacher responded, "Sure." *Id*. at 89.

[10]     Mother and Father testified that the communication between the parties was extremely poor. *Id*. at 62, 63, 113. Mother acknowledged that she struggled financially and had "come up against a brick wall a few times over the last couple years," but managed to make it work. *Id*. at 61. She testified that she worked hard to provide for the Children and that "[t]hey are loved. They are healthy. They are cared for." *Id*. Father testified that he was gainfully employed, was remarried, and that he could provide the stable environment that the children need, including supervising their homework and ensuring Ad.P. goes to school with her glasses every day. *Id*. at 103, 107-08. Father also stated that he would check in with Ai.P. on Mother's days to ensure his homework was being completed. *Id*. at 107-08.

[11]     At the conclusion of the hearing, the trial court issued an order denying Father's petition to modify custody. *Appellant's App. Vol. II* at 11-18. The trial court concluded that:

> Mother is not financially well off. She struggles in comparison to Father's financial resources, but that does not make her a poor mother. Mother has made some mistakes and has openly admitted to the mistakes in court; however, based on a review of the evidence presented and considered by the court in its entirety, the court finds that Father has not met his burden and Father's "Motion for Modification of Custody" is hereby denied.

*Id*. at 18. Father now appeals.

## Discussion and Decision

[12] We begin by noting that Mother has not filed an appellee's brief.[2] When an appellee fails to file a brief, we need not undertake the burden of developing an argument on appellee's behalf. *C.V. v. C.R.*, 64 N.E.3d 850, 852 (Ind. Ct. App. 2016). Instead, applying a less stringent standard of review, we may reverse the trial court's judgment if the appellant can prove a case of *prima facie* error. *Id.* "*Prima facie* error in this context is defined as, 'at first sight, on first appearance, or on the face of it.'" *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006) (quoting *Santana v. Santana,* 708 N.E.2d 886, 887 (Ind. Ct. App. 1999)).

[13] The trial court entered findings of fact and conclusion of law in its order denying modification of custody. Pursuant to Indiana Trial Rule 52(A), the reviewing court will "'not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.'" *Steele-Giri v. Steele*, 51 N.E.3d 119, 123 (Ind. 2016) (quoting *D.C. v. J.A.C.,* 977 N.E.2d 951, 953 (Ind. 2012)). Where a trial court enters findings *sua sponte,* the appellate court reviews issues covered by the findings with a two-tiered standard of review that asks whether the

---

[2] Mother did not file an appearance and did not file a brief in this case. She did make a filing with this court that is styled as a letter and contends that the trial court's order should be affirmed. However, this filing does not follow the Indiana Rule of Appellate Procedure and does not contain any citation to the record or legal authority. It is well settled that pro se litigants are held to the same legal standards as licensed attorneys. *Lowrance v. State*, 64 N.E.3d 935, 938 (Ind. Ct. App. 2016). This means that pro se litigants are bound to follow the established rules of procedure and must be prepared to accept the consequences of their failure to do so. *Id.* We will not become an "advocate for a party, or address arguments that are inappropriate or too poorly developed or expressed to be understood." *Id.*

evidence supports the findings, and whether the findings support the judgment. *Id*. Any issue not covered by the findings is reviewed under the general judgment standard, meaning a reviewing court should affirm based on any legal theory supported by the evidence. *Id.* at 123-24.

[14] There is a well-established preference in Indiana "for granting latitude and deference to our trial judges in family law matters." *Id*. at 124 (citing *In re Marriage of Richardson,* 622 N.E.2d 178, 179 (Ind. 1993)). Appellate courts "are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence." *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind. 2002) (quoting *Brickley v. Brickley,* 247 Ind. 201, 204, 210 N.E.2d 850, 852 (1965)). "On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Id.* "Appellate judges are not to reweigh the evidence nor reassess witness credibility, and the evidence should be viewed most favorably to the judgment." *Best v. Best,* 941 N.E.2d 499, 502 (Ind. 2011) (citations omitted).

[15] Father argues that the trial court erred in denying his petition to modify custody. He specifically asserts that the trial court erred by excluding in its order evidence regarding the best interests of the Children and a substantial change in circumstances that he claims was essential and undisputed. Father contends that this evidence was material to both the best interests of the

Children and showed a substantial change in circumstances regarding the mental and physical health of the Children, the Children's adjustment to home and school, and the interactions between the Children and Mother. He maintains that all of the evidence taken as a whole did not support the trial court's decision to deny his petition to modify custody, and the ruling was clearly against the logic of the facts and circumstances.

[16] The party seeking modification of a custody order "bears the burden of demonstrating [that] the existing custody should be altered." *Steele-Giri* , 51 N.E.3d at 124. "This more stringent standard is required to support a change in custody because permanence and stability are considered best for the welfare and happiness of the child." *Riggen v. Riggen*, 71 N.E.3d 420, 422 (Ind. Ct. App. 2017) (internal quotations omitted).

[17] Indiana Code section 31-17-2-21 provides that a trial court "may not modify a child custody order unless: (1) the modification is in the best interests of the child; and (2) there is a substantial change in one (1) or more of the factors that the court may consider under [Indiana Code section 31-17-2-8] . . . ." Indiana Code section 31-17-2-8 provides that the trial court is to consider all relevant factors, including:

> (1) The age and sex of the child.
>
> (2) The wishes of the child's parent or parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parent or parents;

(B) the child's sibling; and

(C) any other person who may significantly affect the child's best interests.

(5) The child's adjustment to the child's:

(A) home;

(B) school; and

(C) community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian . . . .

[18]   A child custody determination is fact sensitive. In this case, the trial court listened to evidence over the course of two days. It heard testimony from multiple witnesses including Father, Mother, and the Children's teachers. In its order, the trial court examined each of the factors listed above, considered the

evidence presented that it believed was pertinent and determined that Father did not meet his burden and that custody should not be modified.

[19] Father's arguments focus on his claim that the trial court failed to consider certain evidence that he maintains was undisputed and material. Contrary to Father's assertion that the trial court ignored undisputed, material evidence, the evidence he asserts was ignored was actually contradicted by Mother's testimony. We grant latitude and deference to our trial judges in family law matters because appellate courts are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence. *Steele-Giri*, 51 N.E.3d at 124. Here, the trial court was able to observe the witnesses and scrutinize their testimony and then made a determination on what evidence it deemed to be pertinent and credible. The trial court was within its authority to do so, and we do not second guess the trial court's determinations. Father's arguments are simply a request for this court to reweigh the evidence and reassess the credibility of the witnesses, which we do not do on appeal. *Id*.

[20] Father does not assert that the evidence presented at the hearing did not support the trial court's findings or that the findings made by the trial court did not support the trial court's conclusions. The evidence presented at the hearing supported each of the trial court's factual findings such that they were not clearly erroneous. Relying on these findings, the trial court concluded that,

"Mother is not financially well off. She struggles in comparison to Father's financial resources, but that does not make her a poor mother. Mother has made some mistakes and has openly admitted to the mistakes in court." *Appellant's App. Vol. II* at 18. The trial court then concluded that based on a review of the evidence presented and "considered by the court in its entirety," Father had not met his burden. *Id*. We conclude that there was ample evidence in the record to support a determination that there was not a substantial change in the circumstances and that a custody modification was not in the Children's best interests. "On appeal it is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Steele-Giri*, 51 N.E.3d at 124. The trial court did not err in concluding that Father failed to meet his burden.

Affirmed.

Pyle, J., and Tavitas, J., concur.